IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KWESI B. AMONOO,

                    Plaintiff,                         OPINION AND ORDER

          v.
                                                        16-cv-125-slc
WASHETAS, *et al.*,

                    Defendants.

Plaintiff Kwesi B. Amonoo, proceeding *pro se*, has been granted leave to proceed on claims that various medical and non-medical staff members at the New Lisbon Correctional Institution (NLCI) violated the Eighth Amendment and state law by denying him appropriate footwear for his foot conditions and failing to treat injuries he claims he sustained as a result of the denial of that footwear. Before the court is defendants' motion for summary judgment, dkt. 35, which I am granting in part and denying in part.

I am denying summary judgment as to Dr. Syed, a prison physician. There are material facts in dispute concerning whether Amonoo complained of severe pain when he saw Syed on December 8, 2014; if Amonoo's version of events is credited, then Syed's failure to order any treatment for Amonoo may have been deliberate indifference or medical malpractice.

I am granting summary judgment to all defendants except Dr. Syed. Amonoo has failed to produce evidence from which a reasonable jury could conclude that any of these defendants was deliberately indifferent to his foot condition. Amonoo's state law negligence claims as to the non-doctor defendants must be dismissed because Amonoo did not comply with Wisconsin's mandatory notice of claim statute. Finally, Amonoo's medical malpractice claim against Dr. Hoffman must be dismissed because Amonoo has not identified an expert to establish the

standard of care. Unlike his claim against Dr. Syed, Amonoo's negligence claim against Dr. Hoffman is not one in which common knowledge affords a basis for finding negligence.

From the parties' proposed findings[1] and evidence on the record, I find that the following facts are material and not subject to genuine dispute, unless otherwise indicated.

UNDISPUTED FACTS

## I. BACKGROUND

Plaintiff Kwesi Amonoo was incarcerated at New Lisbon Correctional Institution (NLCI) at all relevant times.

All of the defendants state employees who worked at NLCI at the relevant times. Defendant Lynn Washetas is a program director and was a member of the prison's Special Needs Committee. Jean Felber and Carol Walter were nurses and served on the Special Needs Committee. Mathew Martinson is a supervisor on the security staff and was a member of the Special Needs Committee. Defendant James Eggers is a correctional officer. Defendant Todd Forsythe is a lieutenant. Defendant Brendan Ingenthron is an inmate complaint examiner. Dr. Salam Syed and Dr. Karl Hoffman were physicians at NLCI during the relevant time period. Candace Warner is the director of the Health Services Unit, Diane Fladhammer is a captain, and Sally Wess was the Corrections Management Services Director.

Between 2004 and 2006, before he arrived at NLCI, Amonoo was diagnosed with plantar fasciitis, an inflammation of the band of tissue that runs across the bottom of the foot that

---

[1] Several of Amonoo's proposed facts, while relating to his foot condition, are outside the scope of this lawsuit insofar as they concern individuals and events not identified in the Amended Complaint. *See, e.g.*, Plt.'s PPFOF, dkt. 56, Nos. 40-47. I have disregarded such facts. If Amonoo believes that other people have violated his constitutional rights, then he will have to assert those claims in a separate lawsuit.

causes heel pain.  Plantar fasciitis is most common in athletes, overweight people and people with inadequate shoe support.  Conservative treatment options include rest, ice, stretching and pain relievers such as ibuprofen or naproxen.  More intensive treatments include physical therapy, night splits and orthotics, which help distribute weight and pressure more evenly across each foot.

In July 2011, Amonoo transferred from Red Granite Correctional Institution to NLCI. NLCI has these rules about to shoes, which it has set forth in its inmate handbook:

T.  Intake

2. Shoes

b. Inmates must wear state-issued shoes on all off-site trips and visits

c.  Inmates may order personal shoes from the approved vendor catalogs

d.  The DOC does not issue, purchase or authorize special shoe purchases if the inmate is able to wear regular, common shoes available from one of the approved vendor catalogs . . . .

e.  Customized orthotics, lifts, etc. are fabricated to go into state shoes for which they have been fitted.  If inmates wish to have orthotics in their personal shoes, they must order a size in which the device will fit.

f.  Special shoes, such as diabetic shoes, are only issued if an inmate is unable to wear regular shoes as deemed medically necessary.

For security reasons, NLCI requires inmates to wear state-issued shoes during all offsite trips and when they meet with visitors at the institution.  Inmates who wear prison clothes and shoes are more easily identified on offsite trips.  Also , if an inmate's personal property is lost or stolen while he is offsite, then NLCI would incur the cost of replacing the item.  When inmates have visitors, NLCI is concerned that contraband might be introduced into the facility by a covert shoe-swap, a possibility that is minimized if inmates must wear their state-issued shoes.

Because of these security concerns, an inmate can be excused from wearing state-issued shoes on visits and offsite trips only if he has a documented medical restriction or written permission from the security director.

Inmates may buy shoes from outside NLCI, but prison rules require that they order them (and all personal property) from vendors pre-approved by the Wisconsin Department of Corrections (DOC). The DOC provides catalogs for three approved vendors: Union Supply, JL Marcus and Access. These vendor catalogs provide an array of athletic shoe options in various widths, sizes and brands, including Nike and New Balance. Although inmate purchases from non-approved vendors can be authorized on a case-by-case basis, property so purchased still must conform to NLCI's security guidelines.

## II. Medical Care for Amonoo's Plantar Fasciitis, July 2013-August 2014

In July 2013, Amonoo was seen by Dr. Lewandoski, one of NLCI's advanced care providers. Dr. Lewandoski noted that Amonoo's orthotics had worn out. Dr. Lewandoski, who is *not* a defendant in this lawsuit, referred Amonoo to Dr. John Finnell, an offsite consulting podiatrist, for consultation and replacement of the orthotics.

Amonoo saw Dr. Finnell on September 9, 2013. Dr. Finnell diagnosed him with plantar fasciitis, bunion deformities and flat feet in both feet. Dr. Finnell had Amonoo casted for new orthotics and provided him with plastic night splints. Dr. Finnell also recommended that Amonoo order a pair of extra depth shoes to accommodate the orthotic devices and his bunion deformities. Dkt. 38-1, exh. 1000-201. The orthotics were designed to be approximately the same thickness as the removable insoles in commercial athletic style shoes. Decl. of John Finnell, dkt. 39, at ¶12.

When an offsite specialist like Dr. Finnell makes a medical recommendation for an inmate's treatment, it is reviewed by the inmate's treating physician at the institution. If the prison physician agrees with the recommendation, then he or she will write an order implementing the recommendation. The treating physician is not bound by the recommendations of the consulting physician or therapist. The treating physician may adopt or reject any or all of the recommendations in light of the treating physician's own medical judgment and security and other institutional concerns.

On September 12, 2013, Dr. Lewandoski approved Dr. Finnell's prescription for bilateral night splints and custom orthotics. Dr. Lewandoski wrote an order stating that "Patient is to order extra-depth shoes to accommodate orthotics." The next day, a nurse from NLCI's Health Services Unit (HSU) sent Amonoo a memo telling him to "order an extra-depth pair of shoes to accommodate your orthotic devices and your bunion deformities. You can order these out of the vendor catalogues following property rules."

Amonoo returned to see Dr. Finnell on October 7, 2013. Amonoo had not yet purchased extra-depth shoes to accommodate his orthotics. Dr. Finnell wrote an order stating that Amonoo "is to wear athletic style shoe (i.e. New Balance or Nike) to accommodate orthotics." Dkt. 38, exh. 1000-200. In Dr. Finnell's transcribed note from that visit, a copy of which was sent to NLCI, Dr. Finnell stated that he had advised Amonoo to stop wearing state-issued shoes and to wear an "athletic style shoe, *such as* a New Balance or Nike, to accommodate the orthotics." *Id*. at exh. 199 (emphasis added).

At a follow up visit on December 23, 2013, Amonoo told Dr. Finnell that the orthotics were helping, but that he still had pain with activity and especially when he was wearing the state-issued boots. Dr. Finnell again advised Amonoo to stop wearing the state-issued boots and

to wear an athletic-style shoe. *Id.* at 197. That same day, Amonoo filed a request to see a prison doctor about Dr. Finnell's recommendation. On December 24, 2013, a nurse responded that an appointment to discuss the recommendation had been scheduled for the following month.

On January 8, 2014, Amonoo was seen by a nurse in HSU. Amonoo was wearing his personal shoes without his orthotics and the nurse observed that he walked without difficulty. Amonoo told the nurse that he changed his shoes between his state-issued boots and his personal shoes two or three times a day, and that he had ordered a second pair of personal shoes. Amonoo reported that his feet hurt when he wore the state boots. The nurse ordered a physical therapy evaluation and advised Amonoo to alternate his sets of personal shoes when the second pair arrived and to wear his orthotics. After consulting with Dr. Lewandoski, the nurse told Amonoo that the doctor would not be issuing a directive to discontinue Amonoo's state-issued boots because, for security reasons, Amonoo was required to wear state-issued boots when Amonoo had visitors and when Amonoo was transported offsite. *Id.*, dkt. 38-1, Exh. 1000-73-74, 227.

Amonoo saw Dr. Lewandoski the next day, January 9, 2014. Amonoo reported that his plantar fasciitis pain had gotten worse because he didn't have any shoes, state or personal, that accommodated his custom orthotics. He said the orthotics raised his foot too high in regular state boots so he needed the high top ones. Amonoo reported that he had ordered a pair of personal shoes that had not yet arrived. Dr. Lewandoski wrote an order directing the property department "to issue high top boots to fit orthotics" and gave Amonoo lace-up ankle supports. Dkt. 38-1, Exh. 1000-71.

Defendant James Eggers is the intake officer in charge of distributing inmate property. Per Dr. Lewandoski's order, Eggers issued a pair of high top state boots to Amonoo. Although

it is the institution's policy to distribute good, useable shoes before new ones are issued, Eggers issued new boots to Amonoo because no used boots were available.[2]

Amonoo had a follow up visit with Dr. Finnell on February 3, 2014. Amonoo reported that he had been wearing orthotics daily, performing stretching exercises and receiving physical therapy. Dr. Finnell again recommended that Amonoo "discontinue wearing the state-issued boots and only wear athletic style shoes with his orthotics at the correctional facility." Decl. of Candace Warner, dkt. 38-1, Exh. 1000-186.

On February 6, 2014, Amonoo received a pair of Nike high top shoes that he had ordered from Eastbay, a non-approved vendor. The property receipt includes a notation stating "okay per special needs." Dkt. 57-1, Exh. 3. It is unclear who wrote this notation or who authorized the purchase. (The evidence of record does not contain any notes or records from the Special Needs Committee showing that it had granted Amonoo permission to order shoes from a non-approved vendor.)

On March 31, 2014, April 3, 2014, June 12, 2014 and August 19, 2014, Dr. Finnell administered injections into Amonoo's feet to reduce the pain.

### III. March 6, 2014 Meeting with Fladhammer and Warner

On March 6, 2014, Amonoo had an appointment with Dr. Lewandoski to discuss Dr. Finnell's recommendation that he discontinue wearing state-issued boots. Amonoo said the state boots were too tight and the heels too high for his orthotics. Once again, Dr. Lewandoski noted

---

[2] Amonoo alleges that he was issued new boots because Dr. Lewandoski had called the property department and specified that they provide him with new boots. However, the only evidence he offers to support this assertion is inadmissible hearsay. Lewandoski's written order does not use the word "new."

that state boots were required for visits and offsite appointments. Dr. Lewandoski called Candace Warner, the HSU manager, to join this meeting to discuss the security policy with Amonoo, noting that "this discussion was beyond [her] medical purview." Dkt. 38-1, exh. 1000-071. Because the footwear policy implicates security concerns, Warner called Diane Fladhammer, the HSU security liaison, into the meeting.

The parties dispute what was said at this meeting. According to Warner and Fladhammer, they simply told Amonoo that institution policy required inmates to wear state boots during visits and during offsite trips, unless the inmate had a medical restriction or had permission from the security director. Amonoo, however, alleges that Fladhammer and Warner asked him how many visits he goes on a weekly basis and then told him, "You're a big guy. Deal with the pain and wear the state boots."[3]

Neither Warner nor Fladhammer is authorized to issue a medical restriction for an inmate or to grant an exception to the state shoes requirement.

## IV. Special Needs Committee

On July 26, 2014, Amonoo submitted a Health Services Request ("HSR") form and asserted that his rights were being violated because he was being "forced" to wear state boots

---

[3] Amonoo also alleges that Warner and Fladhammer stated him that no inmates at the institution wore personal shoes during visits or off site, a statement that Amonoo contends is false. In support, Amonoo has submitted affidavits from other inmates at NLCI who were allowed to wear their personal shoes on visits and offsite trips. *See* Decl. of Chevy Davis, dkt. 66; Decl. of Emmett Dunlap, dkt. 60; Decl. of Terrill Lawhorn, dkt. 63; Decl. of Gene Blackmore, dkt. 62. I accept these declarations as true for the purposes of summary judgment, but they do not advance the analysis. Amonoo has not produced evidence that either Warner or Fladhammer knew about these inmates. Further, it is unknown whether these inmates were granted this accommodation in the absence of either a medical restriction or permission from the security director. In the absence of such evidence, the allegedly false statement about other inmates is not material to Amonoo's deliberate indifference claim.

even though he had a medical condition that prevented him from wearing them.  The HSR was referred to the Special Needs Committee.  The Special Needs Committee is comprised of one or more staff members from the prison's Health Services Unit, one staff member from prison security and one non-security staff member.  The Committee's purpose is to determine whether a particular medical restriction or special need requested by an inmate or a practitioner is medically necessary, taking into account, among other things, the security level and physical environment of the facility.  Prescribing practitioners at the institution are supposed to refer items to the committee for review rather than write orders for specific items. When the committee receives a special needs request, each committee member reviews the request and makes a recommendation based upon his or her role at the prison.  If the requested item is not medically necessary, it will be denied.  Bureau of Health Services Policy and Procedure #300.07, attached to Decl. of Candace Warner, dkt. 38, at exh. 1001.

Requests for special shoes are covered under Appendix 1 to BHS Policy and Procedure #300.07.  Specifically, Appendix 1 states, in relevant part:

> Bureau of Health Services/Health Services Unit provides customized special medical orthopedic shoes (one that require special customization and fabrication that are made from a mold or plastic cast specifically for the individual at an orthotic company).  Customized orthopedic shoes shall be replaced as determined necessary when showing signs of heavy wear, or no longer cover the foot.  A Class 3 authorization submitted from the requesting medical provider to the appropriate Bureau of Health Services reviewer is required for all medical orthopedic shoes obtained from an orthotic company.
>
> Health Services Unit does not issue, purchase, or authorize special purchases if the inmate is able to wear regular shoes (common shoes that can be purchased from a store or catalog).  Inmates should be encouraged to purchase their own personal shoes.  If a patient is not able to wear the State supplied footwear due to a significant medical condition (i.e. diabetic with foot ulcers or need

for Velcro shoes due to a CVA for independent ADL) and provision of an alternative off the shelf shoe is necessary, the facility shall provide an alternative. These cases are to be very limited and determined on a case by case basis through the established committee/nurse review.

Health Services Unit will not get involved with ordering extra pairs of personal shoes. Property guidelines shall be followed.

Tennis shoes shall not be ordered by the Health Services Unit. Inmates/youths can order tennis shoes according to the property rules. Facility accommodations and exceptions can be made at the facility level and not through Health Services Unit if special situations arise (intake facilities).

At the time of Amonoo's request, the Special Needs Committee members were nurses Jean Felber and Carol Walter, Lt. Mathew Martinson, a security staff supervisor, and Lynn Washetas, a non-security program supervisor. Felber and Walter had access to Amonoo's medical records and provided information about his medical condition to the other committee members. The committee determined that Amonoo's medical chart did not have either a medical restriction or a justification for a special accommodation that would require Amonoo to wear personal shoes at all times or that would excuse Amonoo from wearing state-issued footwear for visits and for offsite trips. The only restrictions regarding Amonoo's foot condition as of August 2014 was Dr. Lewandoski's order for custom-made orthotics, for night splints for Amonoo to be allowed to order extra-depth athletic style shoes to accommodate his orthotics. Accordingly, on August 21, 2014, the committee denied Amonoo's request. Addressing Amonoo, the committee wrote: "Your orthotics were designed to fit in your state issued shoes and should work fine in other sets. There is no need to wear pers[onal] shoes offsite or to visits."

### V. Eggers, Forsythe and Ingenthron

In October 2014, Amonoo's state-issued boots were stolen. Eggers contacted Amonoo to come to intake to pick up replacement boots. Eggers offered Amonoo a pair of used boots, but Amonoo refused. Amonoo demanded a new pair, asserting that he had to have new boots because of his foot problems. Eggers responded that Amonoo would be charged for a new pair if he did not accept a used pair in good condition. Amonoo took a new pair but refused to sign the form accepting responsibility to pay for the boots.

Amonoo was charged $59.66 for the new boots. Upon receiving the charge, he filed an offender complaint, which was investigated by defendant Ingenthron. Ingenthron and Eggers met with Amonoo, who said he wanted to speak with a supervisor about his request for new boots because he had a medical restriction. Forsythe was the supervisor on duty. Amonoo was told he had to take used boots if he wanted the charge for new boots reversed and also was told that he had to wear state boots during visits. Amonoo was told that he would have to conduct his visits through a video monitor if he did not have state boots. Amonoo capitulated and took the used boots. NLCI reversed the charge for new boots.[4]

### VI. Dr. Syed

On October 30, 2014, Amonoo submitted a HSR, stating that his feet were in pain due to staff making him wear used state boots. Amonoo also reported that he heard a "pop" in his left foot while walking back from a visit, and he asked if he had a follow up appointment

---

[4] Amonoo alleges that the used boots had not been sanitized, causing him to develop a fungal infection in his toenails. Amonoo offers no evidence to support these allegations beyond his own conjecture. Accordingly, there is no need to address these allegations.

scheduled with Dr. Finnell. Dkt. 38-1, Exh. 1000-231. The next day, a nurse responded, stating that Amonoo did not have any follow up scheduled at UW but that he was scheduled to see a prison nurse.

When Amonoo saw the prison nurse on November 5, 2014, he reported pain in both feet. Dkt. 38-1, Exh. 1000-65-66. Amonoo said he heard a "pop" in his left foot while walking back from a visit in his used state boots a few days earlier. *Id*. The nurse documented no acute symptoms of distress. According to the nurse's notes, Amonoo's main concern was that he was wearing used state boots that had formed to the first wearer's foot contours, which led Amonoo to believe that his plantar fasciitis had flared up as a result. A follow up appointment with a prison doctor was scheduled for December 8, 2014. *Id*. The nurse indicated that no nursing follow up was necessary and that Amonoo should submit an HSR if there was no improvement. *Id*.

Amonoo saw defendant Dr. Salam Syed on December 8, 2014 for the follow up visit. Syed did not know about Amonoo's pain before this visit. According to Syed's progress notes, Amonoo complained that he had been charged sixty dollars for state boots but acknowledged that the charge had since been reversed. He said that he had been having left ankle pain a month or so ago but it had resolved. According to Syed's notes, Amonoo stated he was "ok" and did not need anything. Dkt. 38-1, Exh. 1000-064. Syed did not prescribe any pain medication or order any further intervention or evaluation of Amonoo's feet or ankles.

At his deposition, Amonoo disputed the accuracy of Dr. Syed's visit summary. According to Amonoo, he did not say he was ok but told Dr. Syed that he was experiencing pain of "100" on a 10-point scale. Although Syed does not have an independent recollection of his visit with

Amonoo, he avers that if Amonoo had complained of pain or discomfort, he would have made a note of it in the medical record.  Decl. of Salam Syed, M.D., dkt. 41, at ¶10.


**VII.  Dr. Hoffman**

On June 16, 2015, Amonoo was seen by defendant Dr. Karl Hoffman, a doctor at the institution, who took over Amonoo's care from Dr. Lewandoski.  Dkt. 38-1, Ex. 1000 at 58-59. Amonoo reported that he had shooting pain in his left foot and that he had lost some toenails from athlete's foot.  Hoffman noted a bony prominence at the back of the left 4th metatarsal. Hoffman noted that several conservative treatment attempts had been made to help Amonoo with reported plantar fasciitis pain, but that he continued to report sharp pain in his left foot. Hoffman wrote a prescriber's order that Amonoo be allowed to wear his personal shoes at all times (including visits) to accommodate orthotics, that he could order his own shoes, and that he could have lace-up ankle braces.  In addition, he ordered an x-ray.  *Id*., Ex. 1000 at 87. According to Dr. Hoffman, he wrote the order permitting Amonoo to wear personal shoes at all times because Amonoo continued to have plantar fasciitis pain despite other conservative treatment and because a podiatrist (presumably Dr. Finnell) had recommended the same. Hoffman felt the recommendation "was appropriate given Amonoo's extensive history and the totality of the treatment that had been provided thus far."  Decl. of Karl Hoffman, M.D., dkt. 40, at ¶10.  Hoffman did not specify an outside vendor for ordering shoes "because many different types of athletic shoes are available in the vendor catalogs that would accommodate" his orthotics and potentially alleviate his reported pain.  *Id*. at ¶11.

Dr. Hoffman next saw Amonoo on August 24, 2015.  He reviewed the left foot x-ray, which had been interpreted as "normal."  But Amonoo still had pain, so Hoffman ordered an

MRI of his left foot. The MRI showed that Amonoo had a torn tendon and evidence of prior partial ligament tears in his left foot, osteoarthritis in one of the joints of his fourth toe and mild medial band plantar fasciitis.

On November 15, 2015, Dr. Hoffman reviewed the MRI and recommended that Amonoo see a podiatrist because of the degenerative changes shown. Amonoo saw Dr. Dawson, an offsite podiatrist, on February 9, 2016. He assessed Amonoo with chronic plantar fasciitis in both feet and tendinitis in his left foot. Dawson recommended plantar fasciotomy of the left foot and he dispensed a trilok ankle brace to Amonoo to reduce the peroneal tendon sprain. Dr. Hoffman reviewed Dawson's recommendation and asked the institution to approve surgery for Amonoo.

Dr. Hoffman's request was approved and Amonoo underwent surgery with Dr. Dawson on April 13, 2016. His post-surgery instructions were to:

- wear a pneumatic air cam boot at all times;

- use crutches with only 50% weight bearing on the left foot;

- elevate his left foot for 45 minutes every hour;

- apply ice behind his left knee every hour; and

- refrain from work and sports for 6 weeks.

Amonoo returned to the prison and was seen by Nurse Felber in the HSU that same day. Dkt. 38-1, exh. 1000-51. Amonoo was not wearing his air cam boot and told Felber that he was going to wear it only in his room and when he slept. Felber informed Amonoo that he needed to wear the air cam boot at all times for proper healing but Amonoo stated that he was not going to do it. After Felber told Amonoo that it would be "awhile" before she could speak to Dr. Hoffman about pain medication, Amonoo left.

Felber related this information to Dr. Hoffman. Dr. Hoffman wrote a prescriber's order for pain medication for Amonoo in which he noted that Amonoo needed to have his air cam boot on and be using crutches in order to get pain medications. Hoffman did this because, based on his medical experience and training, the post-operative instructions were not optional and if Amonoo did not wear the protective boot or follow the other restrictions, he could jeopardize the success of the operation. Decl. of Hoffman, dkt. 40, at ¶20.

Dr. Hoffman saw Amonoo the next day. On his notes, he indicated that Amonoo was not using his crutches or wearing his boot and was ambulating "with surprisingly little discomfort." Dkt. 38-1, exh. 1000-49. Hoffman noted that Amonoo was at risk of excess exertion and that he would not give him pain medication because the pain was protective.

On April 14, 2016, Amonoo went to the HSU and asked to sign a refusal for all medication restrictions. Amonoo was not wearing the air cam boot and was ambulating with 100% weight bearing without difficulty. Dkt. 38-1, exh. 1000-046.

On April 15, 2016, Dr. Hoffman discontinued Amonoo's prescription for pain medication because Amonoo continued to disregard the post-operative instructions and risked doing more damage to the foot if his pain was blocked by medication. Hoffman hoped that the pain would help protect the foot and influence Amonoo to follow post-surgical orders, which would maximize the chance of a good outcome.

### VIII. Denial of Shoes from Non-Approved Vendor (Wess and Hoffman)

In July 2016, Amonoo wrote to defendant Sally Wess, who is the Corrections Management Services Director at NLCI. She is responsible for processing purchasing records

by inmates. Wess does not have authority to grant or deny medical accommodations for an inmate.

In his letter, Amonoo stated that he wanted to ensure that he would receive athletic shoes that he had ordered from Eastbay. Amonoo indicated that he had to wear orthotics and ankle braces and that he was informed by two podiatrists that he should have high top shoes with straps. Eastbay was not an approved vendor. Wess checked Amonoo's special needs record on an internal Wisconsin Department of Corrections database and determined that Amonoo did not have a medical restriction to order shoes from a non-approved vendor. The notation in the database regarding Amonoo said, "Shoes: medical tennis." Wess noted that there was nothing indicating that Amonoo needed high top tennis shoes with straps for support, and she informed him of this.

Shortly thereafter, on August 8, 2016, Amonoo saw Dr. Hoffman. Amonoo reported that he was exercising vigorously, running, playing basketball and yoga, but his left foot was mildly tender. Hoffman noted that Amonoo could "do better" with high top shoes for his activities, which would allow the orthotics to fit in the shoes more safely. Dkt. 38-1, exh. 1000-39. However, Hoffman did not write a prescriber's order specifying that Amonoo should only wear high top shoes.

In October 2016, Amonoo received an order of Nike athletic shoes from Eastbay. A correctional officer, Olsen, contacted Wess to find out if Amonoo could accept them. Wess contacted the HSU manager, Warner, to find out if Amonoo had medical permission to order shoes from a non-approved vendor. Warner replied that HSU had not authorized a purchase from an outside vendor, so this was not a medical issue. Wess then contacted the property office

to inform them that the shoes would be denied because there was no medical order for Amonoo to order shoes from a non-approved vendor.

On November 11, 2016, Dr. Hoffman saw Amonoo for pain in his left foot. He wrote a prescriber's order providing that Amonoo still needed extra depth shoes to accommodate his orthotics, as previously ordered, and directed that he be allowed to order these shoes from a non-approved vendor if needed. Later that same day, Dr. Hoffman wrote a clarification of his order specifying that Amonoo could order the shoes from an approved vendor catalog. He did this after being informed by the nursing staff who had been familiar with Amonoo and his treatment that Amonoo could get what he needed from an approved vendor. When Amonoo asked Dr. Hoffman why he changed the order, Hoffman replied, "Things have changed. I am not allowed to order shoes. Whenever I try recently, I get overruled." Dkt. 38-1, Exh. 1000 at 280-282.

On April 18, 2017, Amonoo returned to see Dr. Dawson. Dawson recommended that Amonoo "have shoes ordered (ideally high top athletic shoes) to accommodate his orthotics." Dkt. 57-1, Exh. 106.

### IX. Physician Declarations and Amonoo's Testimony

Defendants have submitted declarations from Dr. Finnell and Dr. Hoffman explaining and clarifying their orders concerning Amonoo's footwear. According to Dr. Finnell, although he had mentioned the brands "New Balance" and "Nike" in some of his orders, he did not intend to prescribe a specific brand of shoes. He merely had mentioned those brands as examples of athletic-style shoes that would be deep enough to accommodate Amonoo's orthotics. According to Dr. Finnell, "[t]here are many different brands of shoes that would accommodate

Amonoo's orthotics" so long as their insoles are removable. Decl. of John Finnell, dkt.39, ¶¶8, 11. Dr. Finnell has reviewed the Department of Corrections' approved vendor catalogs and believes there are a number of athletic-style shoes available that would fit Amonoo's orthotics. *Id.* at ¶15.

The reason Dr. Finnell had recommended that Amonoo avoid the state-issued shoes was because those shoes did not accommodate the orthotic properly. *Id.* at ¶9. However, Dr. Finnell has no reason to believe that wearing state-issued boots would cause injuries such as plantar fasciitis, torn ligaments or a toenail infection. *Id.* at ¶10.

According to Dr. Hoffman, "high tops with straps" are not medically required for Amonoo. Like Dr. Finnell, Hoffman is of the opinion that Amonoo can order shoes adequate to address his ongoing medical needs through a regular vendor catalog. Decl. of Karl Hoffman, dkt. 40, at ¶¶32-33.

Defendants deposed Amonoo on July 20, 2017. According to Amonoo, the athletic shoes that are available to him through the approved vendor catalogs do not accommodate his orthotics or his ankle braces. He has ordered a half size larger than his usual size 10.5 but the orthotics do not fit well even in a size 11. However, he has only looked at Nike and New Balance shoes because those are the brands that Dr. Finnell "recommended." Amonoo also has limited his search to high-top styles because high-tops are what Dr. Dawson and Dr. Hoffman recommended. Amonoo does not know whether any of the shoes in the vendor catalogs come in wide sizes; he "only look[s] for sizes and [to] see if they're high-tops." Dep. of Kwesi Amonoo, dkt. 52, at 42:7-9. New Balance does not offer high tops so he has only ordered Nikes, but those shoes have ripped when he puts his orthotics in them. Amonoo has not ordered a size

12 to see if his orthotics and braces might fit better because he does not want to waste money on shoes that don't fit.

Amonoo acknowledged that unworn shoes can be returned to the approved vendors. He further acknowledged that he could bring his orthotics and braces with him to the property department to try on with his shoes once they arrived to see if they fit. Amonoo has not taken this approach, however, stating that he "knows" which shoes will work with his orthotics. *Id.*, at 80.

Amonoo has visits at most twice a week. *Id.* at 51:13-14. The visiting room is located about a quarter mile from Amonoo's housing unit. There is no evidence in the record as to how long these visits last or whether Amonoo is seated or standing during the visits. From the record, it appears that Amonoo has offsite visits with medical providers about once a month. There is no evidence that Amonoo goes offsite for any other reason.

At his deposition, Amonoo admitted that no healthcare provider has ever told him that:

> he could/should only wear new boots;

> wearing used boots would exacerbate his foot ailments;

> he suffered injuries as a result of wearing used boots;

> he suffered injuries (torn ligaments) because he wore used boots;

> he suffered injuries (torn ligaments and plantar fasciitis) because he wore boots rather than athletic shoes; or

> he suffered toenail infections because he wore used boots.

OPINION

## I.  Summary Judgment Standard

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel*, 612 F.3d at 937 (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## II.  Eighth Amendment Deliberate Indifference

Amonoo's complaint encompasses four sets of acts taken by various defendants:

(1)  The refusal to allow him to wear his personal footwear at all times between October 2013 (when Dr. Finnell recommended that he "discontinue" wearing state-issued boots) to June 2015 (when Dr. Hoffman ordered it);

(2)  The refusal to allow him to order shoes from a non-approved vendor;

(3)  The medical care that he received for his foot injury and surgery; and

(4)  The refusal to provide him with new state issued boots.

Amonoo argues that all of this conduct by the defendants establishes that they were deliberately indifferent to his foot conditions and associated pain.

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id*. at 828; *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An inmate's claim for deliberate indifference must establish "(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that claim." *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012).

A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 585-85 (7th Cir. 2006). A medical need may be serious if (1) it is life-threatening, carries risks of permanent serious impairment if left untreated or results in needless pain and suffering, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997); or (2) it "significantly affects an individual's daily activities," *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); or (3) it otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer*, 511 U.S. at 847.

At least for purposes of summary judgment, defendants concede that Amonoo's bunions and plantar fasciitis presented serious medical needs. Thus, the issue at the summary judgment stage is whether Amonoo has submitted enough evidence from which a reasonable jury could

conclude that any of the defendants acted with "deliberate indifference" towards Amonoo's specific, serious medical needs related to his feet.

For a prison official to act (or fail to act) with "deliberate indifference" means that s/he "'knows of and disregards an excessive risk to inmate health or safety.'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). "[S]pecifically, he must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id*. (internal quotation omitted); *see also Norfleet v. Webster*, 439 F.3d 392, 397 (7th Cir. 2006) (deliberate indifference is "akin to criminal recklessness, which requires that the defendant be aware of and disregard an excessive risk of serious harm to the inmate"). To establish that a course of medical treatment by prison officials demonstrates deliberate indifference, a prisoner must show that the treatment he received was "blatantly inappropriate." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005). Further, it is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "A state officer is deliberately indifferent when he does nothing . . . or when he takes action that is so ineffectual under the circumstances that deliberate indifference can be inferred." *Figgs v. Dawson*, 829 F.3d 895, 903 (7th Cir. 2016) (internal citations omitted).

### A.  Defendants Warner and Fladhammer

Amonoo contends that Warner, a Health Service manager, and Fladhammer, a security captain, were deliberately indifferent to his foot problems by "forcing" him to wear state boots on visits and offsite, knowing that it caused him pain and that a consulting podiatrist had recommended that he not wear the state boots. In response, defendants point out that Amonoo

could be excused from the state boot requirement only if he had a medical restriction, which neither of these defendants was authorized to prescribe. As of March 6, 2014, on the date Warner and Fladhammer spoke with Amonoo, he did not have a medical restriction to wear personal shoes at all times.

There seems to be some buck-passing going on here: Amonoo's prison doctor, Dr. Lewandoski, kept asserting that the state shoe requirement was a security issue, but when called in to talk to Amonoo, Fladhammer, the security officer, said it was a medical issue. Nevertheless, prison officials generally are entitled to rely on the judgment of medical professionals treating an inmate, *see Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676 (7th Cir. 2012), and it is undisputed that Dr. Lewandoski was (a) treating Amonoo and (b) did not write an order excusing Amonoo from wearing his state shoes on visits and offsite. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (noting that non-medical prison officials can rely on the expertise of medical personnel and will generally be justified in believing that the prisoner is in capable hands). Further, there is no evidence to suggest that Dr. Lewandoski believed that such an order was medically necessary, or that wearing the state boots would cause Amonoo undue pain, or that Dr. Lewandoski said anything to Warner or Fladhammer suggesting these things to be the case.

Amonoo has no evidence that Fladhammer or Warner were authorized to grant the exception without Dr. Lewandoski's approval. Amonoo asserts that Fladhammer could have granted the exception because she "was security," asserting that another lieutenant at the institution granted such an exception for a different inmate, Terrill Lawhorn. Plt.'s Resp. to PPFOF No. 54, dkt. 55, citing Aff. of Terrill Lawhorn, dkt. 63. Amonoo's evidence does not support this assertion. Although Lawhorn asserted that he was allowed to order shoes from non-

approved vendors and is allowed to wear those shoes on visits and transports, he does not say that he was authorized to do so by a security officer. As a result, there is no foundation for Amonoo's contention that any security officer can excuse an inmate from wearing state shoes at visits and offsite.

Amonoo also asserts that Warner could have granted the exception because she provided him with his night splints restriction. This is incorrect. Dr. Lewandoski ordered the night splints; Warner simply ensured that security had inspected the splints before Amonoo received them. Amonoo's evidence does not call into dispute defendants' assertion that they were not authorized to issue the restriction that Amonoo was seeking.

Furthermore, even if Fladhammer or Warner could have granted Amonoo an exception from the state shoes requirement, Amonoo has failed to present evidence from which a jury could conclude that their refusal to do so amounted to deliberate indifference. As just noted, both defendants were aware that Amonoo was seeing Dr. Lewandoski for his foot condition and that she had not issued an order granting the exception. There is nothing in the record to suggest that either Warner or Fladhammer had an independent basis for believing that requiring Amonoo to wear state shoes on visits and offsite trips would put him at risk of further injury or exacerbate his condition. (As noted previously, Dr. Finnell has rejected the notion that wearing the state boots would impose such a risk.)

Although I must assume for summary judgment purposes that Warner and Fladhammer were aware that wearing the state shoes was painful to Amonoo (insofar as they told Amonoo to "deal with the pain"), a refusal to treat temporary, minor pain does not establish a claim of deliberate indifference. *See, e.g.*, *Gutierrez*, 111 F.3d at 1372 (stating that failure to treat a common cold does not support a deliberate indifference claim); *Snipes v. DeTella*, 95 F.3d 586,

591 n. 1 (7th Cir. 1996) (unheeded request for local anaesthetic during toenail removal did not constitute a "serious medical need"), cert. denied, 519 U.S. 1126 (1997); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) (stating that a prison medical staff's refusal to treat minor "ailments for which many people who are not in prison do not seek medical attention does not by its refusal violate the Constitution"). Here, although the record before the court shows that Amonoo complained generally that his feet were "in pain" and that the state boots made the pain worse, there is no evidence that the pain that Amonoo experienced while wearing his state boots was significantly greater than his "typical" plantar fasciitis pain or, more importantly, that he raised these complaints with Warner and Fladhammer.

Also, as Warner and Fladhammer likely knew, Amonoo's visits and offsite trips were infrequent. All that the current record shows is that Warner and Fladhammer knew that wearing the state boots caused Amonoo some amount of discomfort. Without more specific evidence showing that either of these defendants had reason to know that wearing the state boots during a visit or an offsite trip caused Amonoo a substantial amount of pain beyond what he experienced while wearing personal shoes, Amonoo's evidence fails to raise a triable issue as to whether Warner and Fladhammer were deliberately indifferent to a serious medical need.

In sum, neither Warner nor Fladhammer was authorized to excuse Amonoo from the state shoes requirement, and even if they had been, the evidence does not permit an inference of deliberate indifference. Accordingly, summary judgment shall be granted to these defendants on this claim.

## B.  <u>Defendants Martinson, Felber, Washetas and Walter</u>

Amonoo contends that Special Needs Committee members Martinson, Felber, Washetas and Walter were deliberately indifferent to his medical needs because they refused to allow him to wear his personal shoes on visits and off site.[5]  At the meeting when the committee took up Amonoo's request, the nursing staff reviewed Amonoo's medical chart.  The only restriction regarding his foot condition as of August 2014 was Lewandoski's order for custom made orthotics and night splints, and that Amonoo be allowed to order extra-depth athletic style shoes to accommodate his orthotic devices.  There was no medical restriction or doctor's order stating that Amonoo could not wear state boots for visits and off-site trips, or that Amonoo had to wear his personal shoes at all times for medical reasons.

Amonoo contends that Dr. Finnell's recommendation that he "discontinue state issued boots" amounts to a medical restriction, and that the Special Needs Committee was required to implement it.  However, Amonoo has not presented any evidence that would call into dispute the state's evidence that recommendations from specialists outside the prison are just that—recommendations—unless a prison doctor converts it into an actual order.  As of August 2014, Dr. Lewandoski had not done so.  (It was not until June 16, 2015, when a different prison doctor, Dr. Hoffman, issued an order indicating that Amonoo should wear personal shoes at all times.)  In the absence of such an order from Lewandoski (in spite of Amonoo's multiple requests that she do so), it was reasonable for the committee to conclude that it was not medically necessary to exempt Amonoo from the state shoes requirement.  Thus, the members

---

[5] Amonoo also claims that he requested committee approval to order athletic shoes from a non-approved vendor.  There is no record of any specific request by Amonoo.  I surmise that at some point Amonoo *did* have approval from *someone* at the institution because  in February 2014 Amonoo was permitted to receive a pair of Nike shoes from a non-approved vendor.

of the Special Needs Committee did not act with deliberate indifference to a serious medical need because Amonoo's medical record did not identify such a need. More specifically, Amonoo has failed to present evidence from which a reasonable jury could conclude that the committee members actually knew that they were putting him at risk by requiring him to wear his state issued shoes on visits and offsites.

Even if I assume, *arguendo*, that the committee could have issued the order based on Dr. Finnell's recommendation, all Dr. Finnell said was that Amonoo should "discontinue" using the state boots. Without more context, it is not clear whether Dr. Finnell meant for this to be an absolute medical restriction that applied at all times. For example, at the time Dr. Finnell issued some of those orders, Amonoo had not yet begun wearing his personal shoes on a regular basis, so Dr. Finnell my have intended his order to encourage Amonoo to stop wearing the state boots and to wear personal shoes that were a better fit for his orthotics. In any case, Dr. Finnell did not say that Amonoo should "never" wear state boots, he did not say that the orthotics would not work in the state boots, and he did not say that wearing the state-issued boots for short time periods during visits and offsite trips would exacerbate Amonoo's foot condition or cause him undue pain.

Further, in the declaration that Dr. Finnell has submitted in connection with this lawsuit, he explains that he has no reason to believe that wearing state-issued boots would cause the injuries alleged by Amonoo, such as plantar fasciitis, torn ligaments or a toenail infection. Finally, as just noted, Dr. Finnell's recommendation was just that: a recommendation. Although Dr. Finnell might have believed that it would be best for Amonoo never to wear the state boots, the Eighth Amendment does not require prison officials to provide flawless treatment. *Knight*

*v. Wiseman*, 590 F.3d 458, 467 (7th Cir. 2009) (citing *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004)).

In sum, there is no basis to conclude that the members of the Special Needs Committee were reckless in their treatment of Amonoo's foot condition when they declined to exempt him from the requirement that he wear state shoes to visits and offsite.


### C.  Defendants Eggers, Forsythe and Ingenthron

Amonoo contends that in October 2014, defendants Eggers, Forsythe and Ingenthron "forced" him to take used state boots in contravention of to Dr. Lewandoski's order, and that this caused an injury to his foot.  The undisputed facts do not support this claim.

First, there is no admissible evidence to support Amonoo's contention that Dr. Lewandoski ordered that Amonoo be provided with "new" high top state boots.  Her January 2014 office visit notes state only that the property department was to "issue a pair of high top state boots that will accommodate the patient's custom foot orthotics."  Although Amonoo asserts that he heard Lewandoski specify "new" boots in her call to the property department, his claimed recollection is inadmissible hearsay.  Fed. R. Ev. 801, 803.

Second, it is undisputed that Eggers, the intake officer, issued a pair of new high tops to Amonoo in January 2014, but that was solely because a pair of used high tops was not available. Ten months later, when Amonoo had to replace his stolen boots, used high tops were available. Given the choice between accepting the used boots free of charge or taking the new boots but being charged for them, Amonoo chose the used boots.  Thus, neither Eggers, Forsythe or Ingenthron "forced" Amonoo to wear used boots.

Finally, Amonoo has not presented any evidence establishing that he had a medical need for new state-issued footwear. It is undisputed that there was no medical restriction in Amonoo's file stating that he had a medical need for new state issued boots. Amonoo acknowledged at his deposition that no health care provider has ever told him that he could only wear new boots, or that wearing used boots would exacerbate his foot ailments or that Amonoo suffered injuries as a result of wearing used boots. Although Amonoo attributes the "painful pop" that he felt in his left foot in October 2014 to the fact that he was wearing used state boots, he is not qualified to offer this sort of cause-effect opinion. There is no evidence that new state-issued boots were medically required for Amonoo's condition, or that the used boots contributed to his injury or that Eggers, Forsythe or Ingenthron knew or should have known that they were putting Amonoo at risk by failing to provide Amonoo with new state boots free of charge.

### D. **Defendant Wess**

Amonoo alleges that Wess was deliberately indifferent to his foot ailments when she rejected his order of Nike Air Max shoes from Eastbay, a non-approved vendor. Wess is a purchasing manager and is responsible for processing inmate purchase records. Weiss is not on the medical staff. Weiss does not issue medical restrictions. Amonoo has not presented any admissible evidence that Wess had the authority on her own to allow inmates to buy shoes from non-approved vendors.

Even if he had, Amonoo's claim against Wess still would fail because Amonoo has not adduced evidence sufficient to establish that it was medically necessary for him to order shoes from non-approved vendors. Amonoo contends that he was authorized to purchase shoes of

"extra depth" that would accommodate his orthotics, and he insists that none of the shoes in the approved vendor catalogs fit that description. However, the only evidence that he offers to support that assertion is his own say-so, which is not enough to survive summary judgment. *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted."). There is no evidence, for example, that none of the approved vendors offered shoes with removable insoles, or that Amonoo made a good-faith effort to try his orthotics with at least several different types of shoes available from the approved vendors.

Amonoo undermined his assertion on this point at his deposition where he acknowledged that: (1) he only tried Nike shoes; (2) he only tried going up one-half size larger than his regular size; (3) he knew he could return unworn shoes; (4) he knew he could bring his orthotics and braces down to the intake department with him to try on with his shoes when they arrived; but (5) he had never pursued this approach. In short, Amonoo has no specific facts to support his assertion that it was "medically necessary" that he be allowed to order shoes from a non-approved vendor, much less that Wess had reason to know that no shoes from the approved vendors would be adequate. To the contrary, both Dr. Hoffman and Dr. Finnell have opined that there are several shoes offered by the approved vendors, including high-tops, that ought to accommodate his orthotics.

When Amonoo's shoes arrived, Wess did not automatically reject them or turn a blind eye to the situation. Rather, she investigated the situation to determine whether Amonoo's records showed he had a special need or medical restriction that authorized him to purchase shoes from a non-approved vendor. It is undisputed that no such authorization existed. On the

basis of these facts, there is no evidence to support Amonoo's claim that Wess was deliberately indifferent when she denied his shoes from Eastbay.

### E. Defendant Syed

Amonoo contends that Dr. Syed was deliberately indifferent to his foot pain and injury because: (1) Dr. Syed delayed treating Amonoo for more than a month after he first submitted his HSR on November 1, 2014, regarding the "painful pop" he had experienced in his foot after a visit at the prison a few days earlier; (2) Dr. Syed failed to order an x-ray or MRI of Amonoo's foot; and (3) Dr. Syed failed to dispense pain medication.

Because Dr. Syed is a medical professional, the court can find that he was deliberately indifferent only if his treatment decisions were "such a substantial departure from accepted professional judgment, practice, or standards . . . as to demonstrate" that he was not relying "on a professional judgment." *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) (internal quotation marks and citation omitted); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). Conduct that is akin to criminal recklessness—but not medical malpractice or negligence—violates the Eighth Amendment. *Farmer*, 511 U.S. at 836–39.

The first of Amonoo's complaints must be rejected because Amonoo has no evidence to show that Dr. Syed was aware that Amonoo was in pain or needed treatment before Dr. Syed saw him on December 8, 2014. Amonoo was seen by a nurse on November 5, 2014 (four days after he filed his HSU request) and a follow up was scheduled with the doctor for the following month. There is no evidence that Dr. Syed was involved in scheduling this appointment or that he reviewed Amonoo's medical chart before December 8. Moreover, there is no evidence indicating that Amonoo objected to the delay or asked to be seen earlier. In short, there is no

evidence that Dr. Syed was personally involved in the decision to see Amonoo 33 days after he was first seen in HSU.

As for Amonoo's other complaints about Dr. Syed's care, Dr. Syed acknowledges that he did not order diagnostic testing or prescribe pain medications after he saw Amonoo on December 8. He asserts that this is because Amonoo did not report being in any pain or having any problems needing attention at that appointment. Although Syed acknowledges that Amonoo claimed at his deposition to have told the doctor he was in excruciating pain (rating it a "100" on a 10-point scale), he asks the court to find Amonoo's testimony insufficient to create a genuine dispute of fact. According to Dr. Syed, Amonoo's version of the facts is so blatantly contradicted by the record that no reasonable jury could believe it. Br. in Supp., dkt. 36, at 20 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

True, the Court in *Scott*, 550 U.S. at 380, held that a trial court may grant summary judgment when one party's version of events "is so utterly discredited by the record that no reasonable jury could have believed him." In *Scott*, however, the record contained a videotape that proved respondent's version of events to be "visible fiction." *Id*. at 381. No such irrefutable evidence exists to contradict Amonoo's version of events. Rather, the State is asking the court to choose *its* version of events based on the medical record and Dr. Syed's testimony that he would have documented pain had Amonoo complained of it. The court is not allowed to make such a credibility determination when deciding summary judgment. *Townsend v. Fuchs*, 522 F.3d 765, 774 (7th Cir. 2008).

That said, I agree with the State that there are strong reasons to question Amonoo's veracity on this issue. Had Amonoo truly been in "excruciating" pain for more than a month as he alleges, one would expect him to have filed a Health Services Request asking to be seen

ASAP by a physician, *as the nurse had instructed him to do*. Further, at Amonoo's initial visit with the nurse just days after he allegedly injured his foot, the nurse noted no acute symptoms of distress and reported that Amonoo's main concern was that he was wearing used state boots with another person's foot contours in them. Finally, after Amonoo's visit with Dr. Syed, it appears that Amonoo did not ask to be seen for his foot again for approximately six months. This is inconsistent with Amonoo's claim of untreated, unrelenting pain.

In spite of these inconsistencies, it remains the province of the jury to determine whether to believe Amonoo or Dr. Syed. But Amonoo is reminded that if the court ever makes a factual finding that he has fabricated evidence in this lawsuit, then the court will dismiss this case and assess a strike under 28 U.S.C. § 1915(g). *See Amonoo v. Kutina et al*, 15-cv-603-slc, July 14, 2017 Order, dkt. 65 (dismissing case with prejudice and assessing strike against Amonoo's for creating and submitting a blatantly fraudulent document in opposition to defendants' summary judgment motion).

As a final observation, I note that although damages are not an element of liability in a deliberate indifference claim, *Cotts v. Osafo*, 692 F.3d 564, 569 (7th Cir. 2012), in order to recover damages from Dr. Syed, Amonoo will need to show that he was harmed by Syed's alleged failure to act. So far, there is minimal evidence of such harm in the record. Although Amonoo appears to believe that he tore ligaments or tendons in his foot when he heard the "painful pop" and that this would have been detected sooner had Dr. Syed ordered diagnostic testing, he has no medical evidence to establish this fact. No doctor has opined that Amonoo tore his tendon or otherwise injured his foot in October 2014. At best, Amonoo may be able to recover damages for having suffered avoidable pain, but of course that would depend on the jury crediting his testimony.

## F. **Defendant Hoffman**

Amonoo contends that Dr. Hoffman was deliberately indifferent to his serious medical need when Dr. Hoffman refused to give Amonoo pain medication after his April 13, 2016 tendon release surgery. Amonoo's medical file shows that Dr. Hoffman initially prescribed pain medication but ordered that Amonoo could receive it only if he was compliant with his post-surgery instructions, which included that Amonoo wear the air cam boot at all times. After Amonoo failed to comply with the instructions, Dr. Hoffman discontinued the medication order. Dr. Hoffman explained that Amonoo was at risk of jeopardizing the surgery or injuring the foot further if the pain was masked by medication.

Amonoo denies that he failed to comply with his post-surgery instructions. In support, he has submitted affidavits from his cellmate and another inmate who saw him after the surgery. These affidavits fail to create a genuine dispute of fact. Nathaniel Smith, Amonoo's cellmate, avers that he "watched Amonoo struggle up and down the steps while wearing his cam boot and using crutches." Dkt. 59. Smith does not say, however, that he was with Amonoo at all times, that he always saw Amonoo wearing the air cam boot as instructed or that he was wearing it when he visited the HSU after surgery. Similarly, inmate Roy Owens avers that after Amonoo returned from surgery on April 13, 2016, Owens pushed Amonoo to HSU in a wheelchair because he couldn't walk there on his own. Owens does not say, however, that Amonoo was wearing his air cam boot. Dkt. 61. Thus, Amonoo has no evidence from which a jury could infer that he was complying with his post-surgery instructions, or more importantly, that Dr. Hoffman *knew* that Amonoo was compliant.

A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference

that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). Amonoo has no evidence from which a jury could infer that Dr. Hoffman did not genuinely believe that Amonoo was not complying with his post-surgery instructions or that Dr. Hoffman did not believe that that Amonoo could undo the results of the surgery by putting too much weight on his foot if his pain was masked by medication. There is no evidence to support an inference that Hoffman was not exercising medical judgment in deciding to withhold pain medications. To the contrary, the undisputed evidence shows that Hoffman exercised his medical judgment and chose a reasonable course of action to ensure the long-term success of Amonoo's surgical procedure in the face of Amonoo's noncompliance with important post-surgery instructions. This claim must be dismissed.

Amonoo also contends that Dr. Hoffman was deliberately indifferent to his medical needs when he revoked his order permitting Amonoo to purchase shoes from a non-approved vendor. This claim must be dismissed because, as discussed above, Amonoo has failed to adduce admissible evidence from which a jury could infer that there were no shoes available from the approved vendors that would accommodate his orthotics.

### III. Negligence Claims

All of the defendants were employed by the state of Wisconsin at all times alleged in the Amonoo's complaint. This means that, with respect to the non-physician defendants[6], Amonoo was required to comply with Wisconsin's Notice of Claim statute, Wis. Stat. § 893.82, which provides in relevant part:

> (3) Except as provided in sub. (5m), no civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties, and no civil action or civil proceeding may be brought against any nonprofit corporation operating a museum under a lease agreement with the state historical society, unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved. Except as provided under sub. (3m), a specific denial by the attorney general is not a condition precedent to bringing the civil action or civil proceeding.

Pursuant to Wis. Stat. § 893.82(5), the notice required under sub.(3) must be served upon the attorney general by certified mail. Strict compliance with the statute is required. Wis. Stat. § 893.82(2m); *Kellner v. Christian*, 197 Wis. 2d 183, 195, 539 N.W. 2d 685 (1995). Failure to comply requires dismissal of the claim. *Weinberger v. State of Wisconsin*, 105 F.3d 1182, 1188 (7th Cir. 1997) ("A complaint that fails to show compliance with § 893.82 fails to state a claim upon which relief can be granted.").

---

[6]The notice of claim statute does not apply to medical malpractice claims. Wis. Stat. § 893.80 (1m). Further, under Wisconsin law, medical malpractice claims cannot be brought against nurses. *See Lawrence Northern v. Koreen Frisk*, Case No. 13-cv-367-jdp, dkt. 107. Thus, all of Amonoo's negligence claims except those against Dr. Syed and Dr. Hoffman must be dismissed for his failure to comply with the notice of claim statute.

It is undisputed that Amonoo failed to comply with the statute. Of the four notices of claim that he filed, three were deficient because they were not served by certified mail. Decl. of Betty Kruse, dkt. 53, and attached exhibits. The one notice that Amonoo served by certified mail (postmarked August 21, 2014) claims that NLCI staff were denying him his right to access the courts and to fully practice his religion, and says nothing about footwear or his foot ailments. *Id.*, Exh. A. Because Amonoo failed to comply strictly with the notice of claim statute, his negligence claims against the non-medical defendants must be dismissed.

## IV. Medical Malpractice Claims Against Hoffman and Syed

In common with other negligence claims, a claim for medical malpractice includes these four elements: (1) a breach of (2) a duty owed (3) that results in (4) harm to the plaintiff. *Paul v. Skemp*, 2001 WI 42 ¶ 17, 242 Wis.2d 507, 625 N.W.2d 860. Wisconsin law more specifically defines medical negligence as the failure of a medical professional to "exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or similar circumstances." *Sawyer v. Midelfort*, 227 Wis.2d 124, 149, 595 N.W.2d 423, 435 (1999); *Shuster v. Altenberg*, 144 Wis.2d 223, 229, 424 N.W.2d 159, 161–62 (1988).

Amonoo must show that Drs. Hoffman and Syed failed to use the required degree of skill exercised by an average medical provider, he suffered harm and there is a causal connection between the doctors' failures and plaintiff's harm. Wis J–I Civil 1023. Unless the situation is one in which common knowledge affords a basis for finding negligence, medical malpractice cases require expert testimony to establish the standard of care. *Gil v. Reed*, 535 F.3d 551, 557–58 (7th Cir. 2008) (plaintiff may show that an ordinary person could conclude from common experience that his injury would not have occurred had medical providers exercised reasonable

care); *Carney–Hayes v. Nw. Wis. Home Care, Inc.*, 2005 WI 118, ¶ 35, 284 Wis.2d 56, 699 N.W.2d 524.

Amonoo's medical malpractice claim against Dr. Hoffman must be dismissed. As the State points out, Amonoo has not submitted expert testimony to establish the standard of care. Amonoo's situation is not one in which the common knowledge of laypersons affords a basis for finding negligence; in general, laypersons do not know what type of treatment would be appropriate after a plantar fasciotomy, particularly when the patient is not following post-surgery instructions.

The same cannot be said for Amonoo's claim against Dr. Syed. Amonoo alleges that when he saw Dr. Syed on December 8, 2014, he complained that he was in excruciating pain after hearing a pop in his foot a month earlier, and that Syed did nothing in response. Laypersons could properly make a finding of negligence based upon Syed's failure to take any action in response to Amonoo's severe pain complaints. Accordingly, defendants' motion for summary judgment will be granted as to Dr. Hoffman, but denied as to Dr. Syed.

ORDER

IT IS ORDERED THAT the motion by defendants for summary judgment is GRANTED IN PART and DENIED IN PART. It is DENIED as to plaintiff's claims of deliberate indifference and medical malpractice against Dr. Salam Syed, and GRANTED in all other respects.

Entered this 1st day of December, 2017.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge